IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARY PRINCE SERVANCE, )
)
      Plaintiff, )
)
vs. ) No. 07 C 1259
)
BANKUNITED, FSB, a federal savings )
bank, et al., )
)
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Defendants BankUnited FSB, The Mortgage Exchange (TME) and Gavin Beal seek to dismiss portions of plaintiff Mary Prince-Servance's complaint alleging violations of various state and federal laws in connection with a home mortgage loan. For the following reasons we grant BankUnited's motion and deny TME and Beal's motion.

## BACKGROUND

We take the following facts from plaintiff's complaint. Plaintiff is a retired public school administrator. In 2005, as she was contemplating retirement, she heard a commercial advertising mortgage services. She decided that she wished to purchase a new home upon her retirement and called the number in the advertisement. The phone number was for TME, and defendant Beal, a loan officer for the company, answered plaintiff's call. Plaintiff informed Beal that she was seeking a new home and wanted to know more about his mortgage services. Plaintiff and Beal began to have frequent conversations, and plaintiff believed he was trying to befriend her. During these conversations Beal would repeatedly mention his integrity as a person and a loan officer, and also the fact that he was religious. Beal bragged to plaintiff that

he was the number 3 loan officer in Illinois and the top officer at TME. These descriptions were intended to induce plaintiff to believe that Beal was a trustworthy person.

Plaintiff found a housing development of interest and inquired about prices. The base price for a home was $465,000, which plaintiff believed to be well above what she could afford on her fixed income as a retiree. She told Beal about the house and her doubts about owning it. Beal told her that she could purchase the home and that her mortgage payment would be about $1,500 a month. Plaintiff asked how this was possible and Beal responded that she should trust him to do the mortgage for her. Plaintiff expressly told Beal that she did not want an adjustable rate mortgage because she wanted to be sure of her payments every month. Beal told her that he would not give her an adjustable rate mortgage, but instead give her an "ARM," implying that there was a difference between the two. He told her not to worry and that he was going to set her up with the type of loan "rich white folks use to get over." These statements were meant to induce plaintiff's trust in Beal. Plaintiff told Beal that her current income was $6,000-$7,000 a month, but that upon retirement her income would be much less and would be fixed. She told Beal that she was only agreeing to purchase the home based on his assurances that her mortgage would be about $1,500 a month.

Plaintiff then entered into the contract to purchase her present home, which, including upgrades, was priced at $510,000. Based on plaintiff's credit report, Beal knew that she was qualified for the best mortgage rates and terms available on the market. On or about November 19, 2005, plaintiff received a Truth in Lending Statement from TME indicating that her mortgage payments would be between $1,400 and $2,000 a month.[1] Just prior to closing,

---

[1] The complaint states that Beal received this disclosure statement. However we believe this to be a typographical error as the subsequent statement was delivered to plaintiff.

which was set for July 6, 2006, plaintiff received another Truth in Lending Statement from TME indicating that her mortgage payments could be anywhere from $1,900 to $4,400 a month. Plaintiff contacted Beal and asked him about these papers. He told her they were in error and she should ignore them. He then told her that her payments would be about $1500 a month.

At the closing, plaintiff became nervous about the transaction and asked to show the papers to a lawyer. Beal responded that he was a lawyer and would protect her. Plaintiff believed Beal and trusted him due to her reliance on his statements about his character and religion. Beal sat next to plaintiff at the closing and, without fully describing each document, persuaded her to sign and initial each one. Beal presented the documents in a folded fashion so that plaintiff could not read them. Plaintiff trusted Beal as her "attorney" and signed the documents. She concluded the transaction by paying $25,000 of her savings as a down-payment and borrowing the rest under the terms of the mortgage.

The mortgage, funded by BankUnited, was a 40-year loan that required monthly adjustments to plaintiff's interest rate. These adjustments were to begin less than two months after the closing and could permit the interest rate to increase by more than 400%, which would permit plaintiff's mortgage payment to jump from the initial $1,520.72 to as much as $11,405.40 on the first payment change date. Further, the loan was negative-amortizing, meaning that the principal could increase over time.

BankUnited originates loans by associating with mortgage brokers such as TME. BankUnited provides these mortgage brokers with rate sheets, or similar documents, that provide the broker with information regarding BankUnited's loan programs, including the interest rates it would charge qualified borrowers called "par rates." BankUnited encourages

mortgage brokers to arrange for loans with higher than par rate interest rates by offering the broker a portion of the up-charged interest rate called a yield spread premium (YSP). The higher the up-charged interest rate, the higher the YSP. TME accepts YSPs from BankUnited in exchange for securing loans with up-charged interest rates. TME does not reveal to its customers that they are paying rates above those they qualify for, nor that TME is receiving a YSP on the up-charged interest rate loan. BankUnited is similarly aware that TME does not disclose the nature or purpose of the YSP to its customers. In plaintiff's case BankUnited paid TME a YSP of $13,948.06. Neither TME nor BankUnited disclosed to plaintiff the existence of this YSP, or that plaintiff was being charged an interest rate that was higher than the one she qualified for.

In January 2007, plaintiff obtained a copy of her credit report, which stated that the principal on her loan was $10,000 more than it was when she entered into the contract. She contacted BankUnited to report the error. BankUnited stated that there was no error, that plaintiff's was a negative-amortizing loan, that her interest rate was adjustable, and that her payments would soon be due for an increase. Plaintiff then had someone assist her in evaluating her loan documents and she discovered glaring misstatements, including one that stated she was making more than $12,000 a month while working, which was twice her income when employed, and almost three times her fixed income upon her retirement, which is approximately $4,200 a month. TME and Beal knew that plaintiff was not making $12,000 a month.

Plaintiff filed this complaint against TME, Beal and BankUnited alleging violations of the Real Estate Settlement Practices Act (RESPA), the Illinois Consumer Fraud and Deceptive Practices Act (ICFA), and common law claims of fraud, breach of fiduciary duty and

inducement to breach a fiduciary duty. Defendant BankUnited seeks to dismiss Counts II and V, the ICFA and inducement to breach fiduciary duty claims, respectively, arguing that those state law causes of action are preempted by the Home Owner's Loan Act (HOLA). Defendants TME and Beal move to dismiss Count I (fraud) for failure to plead the allegations with specificity as required by Federal Rule of Civil Procedure 9(b). They also seek to strike Count III (RESPA) as it pertains to them because, they argue, plaintiff has failed to sufficiently allege a violation of RESPA's fee-splitting provision.

## ANALYSIS

On a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), the well-pleaded allegations of the complaint must be accepted as true and the court must draw all reasonable inferences in favor of plaintiff. McMillan v. Collection Prof'ls, Inc., 455 F.3d 754, 758 (7th Cir. 2006). Plaintiff need only allege the "operative facts" upon which each claim is based (Kyle v. Morton High School, 144 F.3d 448, 454-55 (7th Cir. 1998)), and include allegations in the complaint that "plausibly suggest that the plaintiff has a right to relief." E.E.O.C. v. Concentra Health Servs., 496 F.3d 773 (7th Cir. 2007)(quoting in part Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1964 (2007)).

We begin with BankUnited's motion. BankUnited argues that Counts II and V must be dismissed because as state claims they are preempted under HOLA due to BankUnited's status as a federal savings bank. HOLA, enacted in response to a nationwide home mortgage crisis during the Great Depression, empowered the Federal Home Loan Bank Board, now the Office of Thrift Supervision (OTS), to authorize the creation and regulate the conduct of federal savings and loan associations. 12 U.S.C. §§ 1463(a), 1464(a). OTS has long held the position that "federal lending law and regulations occupy the entire field of lending regulation

for federal savings associations" in order to avoid a "hodgepodge of conflicting and overlapping state lending requirements" that would be inefficient and significantly burden the associations' ability to create nationally uniform lending practices. 61 FR 50951, 50965 (1996).

At the heart of this matter is the OTS regulation on applicability of law, which states:

> (a) [F]ederal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.
>
> (b) Illustrative examples. Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:
>
>> (1) Licensing, registration, filings, or reports by creditors;
>> (2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;
>> (3) Loan-to-value ratios;
>> (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
>> (5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;
>> (6) Escrow accounts, impound accounts, and similar accounts;
>> (7) Security property, including leaseholds;
>> (8) Access to and use of credit reports;
>> (9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;
>> (10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;
>> (11) Disbursements and repayments;

> (12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and
> (13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.
>
> (c) State laws that are not preempted. State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:
>
> > (1) Contract and commercial law;
> > (2) Real property law;
> > (3) Homestead laws specified in 12 U.S.C. 1462a(f);
> > (4) Tort law;
> > (5) Criminal law; and
> > (6) Any other law that OTS, upon review, finds:
> >
> > > (i) Furthers a vital state interest; and
> > > (ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

12 CFR 560.2

OTS' additional guidance on this regulation makes clear that if the law falls into one of the categories listed in 560.2(b), it is preempted and no further analysis is needed. 61 Fed. Reg. 50951, 50965-67 (1996). If, instead, the law is one of general applicability, then the analysis under 560.2(c) comes into play. *Id.* OTS has stated that it added this two-part test to the regulation to identify "state laws that may be designed to look like traditional property, contract, tort, or commercial laws, but in reality are aimed at other objectives, such as regulating the relationship between lenders and borrowers...." *Id.* To analyze a state law under this test the court will first determine whether the law affects lending. If so, then a presumption of preemption arises. The presumption can be reversed "only if the law can clearly be shown to fit within the confines of paragraph (c)." *Id.* For these purposes,

"paragraph (c) is intended to be interpreted narrowly," and "any doubt should be resolved in favor of preemption." *Id.*

Plaintiff alleges that BankUnited violated the ICFA and induced TME to breach its fiduciary duty to plaintiff. BankUnited argues that the state laws making up the foundation of these claims are preempted for two reasons: first, plaintiff is seeking regulation of YSPs, which are loan-related fees, and second, the laws as applied in this context more than incidentally affect lending. Plaintiff does not respond to BankUnited's argument that YSPs are loan-related fees, but instead argues that OTS' regulations only preempt laws that regulate a federal savings association's lending activity, and not laws of general applicability. This states the issue too broadly. *See* Lopez v. World Savings and Loan Ass'n, 105 Cal. App. 4th 729, 741 (Cal. App. Ct. 2003). It is clear from the language of the regulation and subsequent caselaw that to the extent a generally applicable law interferes with a federal savings association's lending activity it is preempted. *Id.*; Haehl v. Washington Mutual Bank, 277 F. Supp. 2d 933 (S.D. Ind. 2003); Moskowitz v. Washington Mutual Bank, 329 Ill. App. 3d 144 (Ill. App. Ct. 2003); Monroig v. Washington Mutual Bank, 19 N.Y.S.2d 563 (N.Y. 2005); Weiss v. Washington Mutual Bank, 147 Cal. App. 4th 72 (Cal. App. Ct. 2007). The Seventh Circuit recently made this clear in In re Ocwen Loan Servicing, 491 F.3d 638, 643-645 (7th Cir. 2007)(analyzing federal preemption of numerous state law claims including the ICFA). Thus, whether any given generally applicable state law will be preempted depends solely on whether the conduct complained of falls within the scope of OTS' regulation. *Id.* Here, plaintiff does not rebut BankUnited's argument that YSPs are loan-related fees. Consequently, this would appear to be the end of the issue as laws attempting to regulate loan-related fees are explicitly preempted under § 560.2(b)(5). But even if YSPs are not loan-related fees, plaintiff clearly

alleges that BankUnited failed to disclose the YSP paid in plaintiff's loan transaction. Whether or not a certain term of a loan agreement must be disclosed is also listed as an area within the exclusive purview of the federal laws, and thus plaintiff's state law claims are preempted. § 560.2(b)(9). Furthermore, any state regulation as to whether and how a YSP may be paid or disclosed more than incidentally affects lending since any decision in plaintiff's favor would place substantive requirements on the disbursement of YSPs that may or may not be congruous to the requirements of other states. Such a "hodgepodge" of state regulations is exactly what OTS was attempting to prevent through preemption. Haehl v. Washington Mutual Bank, 277 F. Supp. 2d 933, 942 (S.D. Ind. 2003).

This conclusion does not leave plaintiff without a remedy. Counts II and V are still viable as they relate to TME's alleged conduct. Additionally, plaintiff may still challenge BankUnited's YSP practices under RESPA, a claim constitutes Count III of plaintiff's complaint and one to which BankUnited has already filed an answer.

Fraud

We turn then to TME and Beal's motion to dismiss Count I (fraud) and to strike Count III (RESPA). To state a claim for fraud under Illinois law, plaintiff must allege that (1) defendant made a false statement of material fact, (2) defendant knew the statement was false, (3) defendant intended to induce plaintiff to rely upon the false statement, (4) plaintiff relied on the misrepresentation, and (5) plaintiff suffered injury as a direct result of the reliance. Time Savers, Inc. v. LaSalle Bank, N.A., 371 Ill. App. 3d 759, 771 (Ill. App. Ct. 2007) Furthermore, plaintiff's reliance on the false statement must have been reasonably justified. Miller v. William Chevrolet/Geo, 326 Ill. App. 3d 642, 651 (Ill. App. Ct. 2001)

Rule 9(b) requires that allegations of fraud be pled with particularity. This requires

that plaintiff plead the who, what, when and where of the alleged fraud. <u>Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.</u>, 412 F.3d 745, 749 (7th Cir. 2005). However, the particularity requirement of Rule 9(b) must be read together with the liberal notice pleading standard of Rule 8. <u>Tomera v. Galt</u>, 511 F.2d 504 (7th Cir. 1975). It must also be applied in light of its purposes, which include informing defendants of the nature of the claimed wrong and enabling them to formulate an effective response and defense. <u>Reshal Assoc., Inc. v. Long Grove Trading Co.</u>, 754 F. Supp. 1226, 1230 (N.D. Ill. 1990).

TME and Beal argue that plaintiff has failed to allege fraud with the requisite particularity. Specifically, they argue that plaintiff fails to plead the specific dates of her conversations with the defendants, and fails to identify the method of communication by which the statements were made. Finally, they argue that she fails to identify any false statements that the defendants made to others, as she alleges in paragraph 68 of her complaint. As to plaintiff's allegation that defendant Beal falsely held himself out to be an attorney, and her claim that Beal and TME made false statements to others, we find plaintiff has clearly plead the who, what, when, and where of these claims. Plaintiff alleges that defendant Beal represented to her at her closing that he was an attorney. Plaintiff also asserts that TME and Beal misrepresented her income on her loan application, thus making a false statement to others in connection with her loan. These allegations are sufficient to support a claim of fraud.

We further find that plaintiff's remaining claims, while a bit lacking on their specific chronology, nevertheless satisfy Rule 9(b)'s requirements. It is true that plaintiff fails to state the dates of any of her conversations with Beal, outside the date of the closing, and that she fails to state the method of any of those communications, except for the initial one, which was by telephone. However, we note that the heightened pleading standard of Rule 9(b) does not

require adherence to blind formalism. Byczek v. Boelter Cos., 264 F. Supp. 2d 720, 722 (N.D. Ill. 2003) The purpose of the rule "is to force the plaintiff to do more than the usual investigation before filing his complaint." *Id.*, quoting Ackerman v. Northwestern Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999). Here, plaintiff states with specificity the content of the alleged misstatements and who made them. Furthermore, by giving certain dates she lays out a general time-frame, putting defendants on notice of the dates of their alleged misconduct. We find that since plaintiff has plead with great specificity the who and what of her fraud claim, along with more general allegations as to time and method of those communications, she has sufficiently put the defendants on fair notice of the alleged conduct complained of, and thus has complied with the requirements of Rule 9(b).

Justifiable Reliance

Defendants TME and Beal also argue that plaintiff's reliance on the allegedly false statements was not justified as a matter of law. Generally, the question of justifiable reliance is best suited for the trier of fact, as one must consider all of the circumstances surrounding the transaction in making a determination. Reis Robotics USA, Inc. v. Concept Indus., 462 F. Supp. 2d 897, 910 (N.D. Ill. 2006). Defendants direct us to the Seventh Circuit's opinion in Runnemede Owners, Inc. v. Crest Mortgage Corp., 861 F.2d 1053 (7th Cir. 1988), and Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570 (7th Cir. 2001), which hold that such a determination can be made as a matter of law in certain situations. We do not find this to be one of those situations. In Runnemede, the Seventh Circuit found that an experienced businessman was not justified as a matter of law in relying on false statements that were made contemporaneously with, but contradicted, explicit terms in the contract that he was signing. *Id.* There, the plaintiff received and purportedly read the contract, and questioned the

defendant about the provision in question. *Id.* at 1055. The defendant then made statements that expressly contradicted the terms of the contract. *Id.* The court found that plaintiff's position, level of experience and circumstances surrounding the transaction precluded him from justifiably relying on the oral statements of defendant. *Id.* at 1059. In <u>Cozzi</u>, the court found that since the plaintiff could have discovered the fraud by reading the contract, and had an opportunity to do so, his reliance on the misrepresentations was not justified as a matter of law. 250 F.3d at 574.

We find the instant case easily distinguishable from <u>Runnemede</u> and <u>Cozzi</u>. Here, plaintiff is a retired public school administrator. While it is not clear that she is an unsophisticated consumer, that is certainly an inference we can draw from the complaint. Additionally, Beal's alleged statements about his character and religion, his statements about the type of mortgage she would be receiving, and his misrepresentation that he was an attorney, all support plaintiff's claim that she justifiably relied on defendants' false statements. Finally, plaintiff was not afforded the opportunity to read the contract, as Beal purposefully folded it in such a way that the text was obscured. When plaintiff requested to have a lawyer look it over, Beal represented that he was a lawyer and would take care of plaintiff. We find that plaintiff has adequately plead justifiable reliance. No more is required at this stage. <u>Reis Robotics</u>, 462 F. Supp. 2d at 910.

## RESPA

Defendant TME argues that plaintiff has failed to allege that TME split an unearned fee with a third party and thus has not stated a claim under RESPA's prohibition against fee-splitting. 12 U.S.C. § 2607(b). We first note that TME does not appear to take issue with plaintiff's contention that the YSP constituted a kickback in violation of § 2607(a), and so to

the extent that plaintiff so alleges, Count III stands without discussion.

TME claims that in order to support a fee-splitting claim under § 2607(b), plaintiff must allege that TME split a fee with a third party. The text of the relevant provision states:

> (b) Splitting charges. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

Plaintiff alleges that she paid a fee to BankUnited in the form of interest payments based on an up-charged interest rate, and that BankUnited split this fee with TME in the form of an unearned YSP. She alleges that the YSP was unearned because it was in excess of any amount TME should have reasonably received for its services. TME argues that this is not enough, that plaintiff must allege that TME split the fee with a third party. Defendants point us to the Seventh Circuit cases of <u>Echevarria v. Chicago Title & Trust Co.</u>, 256 F.3d 623 (7th Cir. 2001) and <u>Weizeorick v. Abnamro Mtg. Grp.</u>, 337 F.3d 827 (7th Cir. 2003), which both hold that in order to sustain a violation of § 2607(b) plaintiff must allege that the fee was split between defendant and a third party. As we understand this argument, TME claims that plaintiff must allege that TME was the recipient of the fee and that it then split the fee with an additional third party. But this is not what the statute requires, nor do either <u>Echevarria</u> or <u>Weizeorick</u> stand for such a proposition. The statute explicitly prohibits the splitting of the fee on both sides of the transaction, by the payer *and* by the recipient. In this case, TME is alleged to have accepted the illegal fee in connection with a transaction other than for services actually performed. It received this fee from BankUnited. Plaintiff need not allege that TME split that fee again with another third party. Plaintiff's RESPA claim stands.

## CONCLUSION

For the foregoing reasons, we grant defendant BankUnited's motion to dismiss, and deny TME and Beal's motion to dismiss.

                                                                   JAMES B. MORAN
                                          Senior Judge, U. S. District Court

_Nov 1_, 2007.